CASE 119.—ACTION BY J. M. HALEY AGAINST GEORGE CHAPMAN AND WIFE FOR MONEY WRONGFULLY CONVERTED.—APRIL 21.

# Chapman and Wife v. Haley.

APPEAL FROM LAUREL CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANTS APPEAL. REVERSED.

ILLEGAL CONTRACT—RECOVERY OF SUMS PAID—SALE OF COUNTERFEIT MONEY—INTENTION OF PARTIES—EVIDENCE—APPEAL—JURISDICTION.

HELD: 1. In an action to recover money advanced by plaintiff to defendant for investment, and alleged to have been fraudulently converted by defendant, plaintiff testified that defendant told plaintiff that defendant would give plaintiff $3,000 in money, not counterfeit, in return for $300, and that the only thing wrong about the money was that, when deposited in a bank, two numbers running of the same date might be detected; that plaintiff paid the $300, but defendant failed to deliver any money. HELD, that it was evident that plaintiff intended to purchase counterfeit money.

2. One who gives another consideration for the sale to him of counterfeit money, which is not delivered as agreed, can not recover the money paid.

3. An appeal from a judgment for $175 is dismissible because less than the jurisdictional sum.

W. R. RAMSEY, E. H. JOHNSON, FOR APPELLANT.

1. Summing up the authorities, we feel justified in saying that the statute of limitations was not avoided in this case, and should have been held to be a bar to the prosecution of this action. The court below erred in not so holding.

2. The pleadings and facts shown thereunder in this case did not sustain the judgment of the lower court.

3. The court neither sustained the attachment herein by his judgment, nor overruled the motion to discharge same in his judgment.

Lastly. Whatever view may be taken of this case, we insist that it was error to adjudge a lien on the land of Gertie Chapman, the wife of George Chapman, and order said land to be sold to satisfy said judgment. The court did not cancel, nor set aside the deed, and neither did the pleadings or the evidence justify said judgment.

Wherefore, appellees most respectfully but earnestly ask that this case be reversed.

## AUTHORITIES CITED.

Stapp v. Mason, 24 Ky. L. R., 1680; section 2532 Ky. Stats., 1903 ed.; Am. & Eng. Ency. of Pl. & Pr., vol. 19, pp. 212, 213; Amy v. Watertown, 22 Fed. Rep., 418; 130 U. S., 320; Nash v. Eldorado Co., 24 Fed. Rep., 252; Engel v. Fisher, 102 N. Y., 400; Miller v. Lesser, 71 Iowa, 147; Chemical Nat. Bank v. Kissane, 32 Fed. Rep., 429; Sneed v. Hall, 2 A. K. Mar., 22; McDonald's Ex. v. Underhill's Ex's., 10 Bush, 584; Nunez v. Taylor & Williams, 91 Ky., 461.

T. J. COYLE, ATTORNEY FOR APPELLEE.

This is a case where Chapman, under the assumed name of George Jones, got the confidence of J. M. Haley and made him believe that for $300 in gold certificates he would get him a certain amount of silver certificates, and decoyed Haley off to Cincinnati and there beat him out of his money.

Chapman is a swindler, strong minded and unscrupulous, while Haley is a man of weak mind, below the average, and it is a case of the strong preying on the weak.

Chapman was permitted to testify in behalf of his wife, as to her ownership of the property which Haley seeks to subject to his debt, which Haley excepted to and which should have been sustained.

A swindler should have no standing in court, and the contention of appellant that both are guilty of misconduct should not be allowed to weigh when a man of strong mind hunts out and by falsehood secures the hard-earned dollars of an honest, unsuspecting, weak-minded farmer.

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING.

This action was instituted by the appellee to recover of appellant, George Chapman the sum of $300, alleged to have been given him by appellee to be invested in some manner not stated in the petition, and which he had fraudulently converted to his own use, and failed and refused to pay over or return to appellee. As an ancillary remedy, an attachment was sued out and levied upon a small tract of land situated in Laurel county, Ky., the title of which was in Gertie Chapman, the wife of George Chapman. The wife was made a defendant, and the allegation made against her that the land was purchased with the money of which appellee had been defrauded; and the prayer was made that the conveyance to the wife should be canceled, the land sold, and the proceeds applied to the repayment of appellee's debt. Separate answers were filed by the husband and wife, placing in issue all of the material allegations of the petition. A judgment was rendered by the chancellor awarding a personal judgment against George Chapman for $175, sustaining the attachment levied upon the land, canceling the conveyance to the wife, and subjecting it to the payment of appellee's debt. From this judgment, both husband and wife have appealed.

Appellee's evidence revealed the following state of facts, upon which he predicated his right to the judgment he obtained: About five years before the institution of this action, appellant, who lived in Laurel county, came to the home of appellee, in Madison county, and there pro-

Chapman and Wife y. Haley.

posed to him that if he would meet him in Cincinnati, Ohio, he would sell to him $3,000 of "good" money for the sum of $300. This proposition was accepted by appellee, who, not having the $300, took two of his neighbors into his golden venture, each of whom contributed $62.50. In pursuance of this arrangement, appellee met appellant in Cincinnati, in a small room, at night, and there turned over to him the sum of $300, relying upon the word of the latter to return in fifteen or twenty minutes with the promised $3,000 of good money in exchange for his $300. To his great surprise, appellant failed to return, and appellee neither saw nor heard of him again until just prior to the institution of this action.. That appellee fully understood that, under the contract, he was to purchase counterfeit money from appellant, can not be doubted. The following excerpts from his evidence, as shown by the bill of exceptions, will fully illustrate what he knew of the moral quality of the transaction: "He [Chapman] told me he would give me $3,000 for $300, and showed me the kind of money. He told me there was a firm in Cincinnati that had this money, and he was one of the members. He was to get me $3,000 for $300. I gave him the $300. He showed me new bills, one 2 and a 20, and I think a 5 and a 10, and he had plenty of it, apparently. The money I was to get was to be just like those he showed me. Silver certificates, and not counterfeit. I gave him the $300 in Cincinnati. I gave it to him in the night. No one was present at the time I gave it [the money] to him. We were in a little room, where there was a light and I counted the money out to Mr. Jones, as I thought, then. Q. Was there any agreed time as to when he was to return with your $3,000? A. He told me to sit down here on the

walls of the water works, and he would step right across the street here, and would get it, and be back in twenty minutes, and he never returned." In answer to a question regarding the character of the money, appellee stated that "he [Chapman] told me it was good money, and said there was only one trouble about this money, and that was, when deposited in bank, two numbers running of the same date might be detected in that way. He said that was the only trouble. Q. What did you understand there was wrong with that money, that bankers might detect? A. Just only what he said about the numbers. I did not doubt the money at all. Q. Did you really believe that you were going to get $3,000 good and lawful money for $300? A. Yes, sir." It is unnecessary to say that this conspiracy between these two men to purchase counterfeit money constituted an illegal contract and was void. The possession of counterfeit money for the purpose of circulation constitutes a crime both under the federal and State statutes. The question as to whether or not appellee, who was equally guilty with appellant, can recover the money paid by him in pursuance of this criminal conspiracy, is the first question for adjudication.

In the case of Kimbrough v. Lane, 11 Bush, 556, the contract was for the payment of $3,000 to secure the dismission of an indictment against Lane for felony. In affirming a judgment dismissing the petition in the action wherein it was sought to recover the $3,000, this court said: "It is sufficient to say on this point that the rule of law inhibiting such contracts was not made for the benefit of the obligors. The courts will not enforce such contracts, because they are leveled at the safety and repose of society, and are calculated to shield the guilty from pun-

Chapman and Wife v. Haley.

ishment and leave them free to prey upon the public. If money is paid upon such a contract, the courts will not aid in recovering it back. They will leave both parties in the exact position in which they have placed themselves." In the case of Gray v. Roberts, 2 A. K. Marsh. 209, 12 Am. Dec. 383, it is said: "If both parties are equally guilty of a breach of the law, a court of justice can not interpose to aid in behalf of either, for it is a settled rule that '*in pari delicto potior est conditio defendentis.*' . . . In the case of Davezac v. Seiler, 12 Ky. Law Rep. 599, the superior court, through Judge Barbour, said: "But aside from the question of mistake, we are of the opinion that, where property is sold at a judicial sale, an agreement by the purchaser to give one an interest in it, or some benefit, if he will not object to the confirmation of the sale, is void as against public policy. The effect of it is to prevent fair competition, and to sacrifice the property of the debtor. As the money sought to be recovered in this case was voluntarily paid under such an agreement, it can not be recovered back." In the case of Smith v. Richmond, 24 Ky. Law Rep. 1117, 70 S. W. 846, it appeared that the plaintiff was running a lottery office in Cincinnati, Ohio, and that, to unlawfully obtain immunity at the hands of the officers of the law, he paid Richmond, from time to time during a period of seven years, various sums, aggregating $16,075. These sums were pocketed by Richmond, and not paid over to the police authorities as agreed. In affirming a judgment dismissing the petition seeking a recovery of the money so paid, this court said: "To allow the appellant to recover in this case would be, in effect saying to all parties that 'you can go on with reasonable safety, furnish money to a person for illegal and criminal purposes, and, after

you have derived the benefit therefrom, sue the so-called agent and recover back the money, unless he, perchance, was able to prove to the satisfaction of the court that he, in like manner, had paid over the money for the said unlawful purpose.' As before stated, we do not think that Richmond was the agent of plaintiff, in the legal sense of agency, but was simply one of the partners in crime; and we know of no court that has ever sustained a suit of one partner for an accounting of the money invested in an unlawful purpose, especially if such purpose was to violate the criminal laws of a State, and shield offenders from punishment, or corrupt public officers."

In the case of Central Trust & Safe Deposit Company v. Respass, 23 Ky. Law Rep. 1905, 66 S. W. 421, 56 L. R. A., 479, Respass & Sharp were partners in "bookmaking." which was an arrangement by which the partners carried on a betting business on horse races; and they also owned, in partnership, a racing stable. Sharp died suddenly, having in his possession at the time $4,724 of the firm's money, which had not been divided at the time of his death. The trust company qualified as his executor, and Respass brought a suit against it for a division of the money constituting the "bank roll." In reversing the judgment of the lower court this court, through Judge Du Relle, delivered an opinion reviewing the authorities on the subject in hand, and fully sustaining the doctrine of the cases hereinbefore recited; and among the cases reviewed is one peculiarly analogous to that at bar, of which it was thus said: "One of the most interesting cases upon this subject is that of Everett v. Williams—the celebrated highwaymen's case, an account of which is given in 9 L. Q. B. 197. That was a bill for an accounting of a partnership business of highwaymen, though the true nature of the

partnership was veiled in ambiguous language. The bill set up the partnership between defendant and plaintiff, who was 'skilled in dealing in several sorts of commodities;' that they 'proceeded jointly in the said dealing with good success on Houndslow Heath, where they dealt with a gentleman for a gold watch;' that defendant informed plaintiff that Finchley 'was a good and convenient place to deal in,' such commodities being 'very plenty' there, and if they were to deal there, 'it would be almost all gain to them;' that they accordingly 'dealt with several gentlemen for divers watches, rings, swords, canes, hats, clocks, horses, bridles, saddles and other things, to the value of £200 and upwards; that a gentleman at Black Heath had several articles which defendant thought 'might be had for little or no money in case they could prevail on the said gentleman to part with the said things;' and that 'after some small discourse with the said gentleman, said things were dealt for at a very cheap rate.' The dealings were alleged to have amounted to £2,000 and upwards. This case, while interesting from the views it gives of the audacity of the parties and their solicitors, sheds little light upon the legal question involved, for the bill was condemned for scandal and impertinence. The solicitors were taken into custody and 'fyned' £50 each for 'reflecting upon the honor and dignity of this court;' the counsel whose name was signed to the bill was required to pay the cost; and both the litigants were subsequently hanged at Tyburn and Maidstone, respectively, while one of the solicitors was transported."

As appellant does not seem to require the supervising care of a committee to conduct his case, his naive declaration, that he believed he was to get $3,000 "in good money" for $300 in old, worn government bills, may be regarded

as apocryphal, although we can not but sympathize with the pleasing simplicity with which he ignores the patent fact that the goodness of the "new silver certificates," barring the peccadillo as to the "numbers." constitute their chief bane, and affords a constant ground for the watchful anxiety on the part of the government detectives; and the same may be said of the untutored faith with which he watched in vain for the promised return of his co-tenant in crime. Taken as a whole, we do not believe the books disclose a parallel in audacity to the case at bar, saving always the history of the dark-lantern firm of Houndslow Heath, detailed above. That a like judgment did not overtake the parties litigant here, as dissolved the ancient partnership, marks the lapse of our modern procedure from that vigorous integrity with which the ancient judges administered the common law in its primitive virtue.

In Am. & Eng. Ency. of Law, vol. 15, p. 1001, the rule is thus stated: "And so, when money is paid on an illegal contract, or personal property is transferred, the aid of the law can not, as a rule, be invoked for its recovery, although the other party refuses to perform his part of the contract." Under the foregoing authority, we would reverse this judgment as a whole, but for the fact that the personal judgment against George Chapman is for only $175, which is less than the jurisdictional sum provided by the statute regulating appeals to this court. Under the authority of the case of Rhodes v. Frankfort Chair Company (decided March 17, 1904) 25 R. 2042, 79 S. W. 768, his appeal must be dismissed for want of jurisdiction.

The judgment as to Gertie Chapman is reversed, with directions to set aside the judgment and dismiss the petition as to her.