## American Manufacturing Company v. Crittenden Record-Press, et al.

(Decided November 5, 1915.)

Appeal from Crittenden Circuit Court.

1.  Contracts—Popularity Contest—Fraud.—Plan of a popularity contest considered and held to be based on deceit and falsehood and to constitute a fraud on the contestants and the public in general and, therefore, void as against public policy.

2.  Contracts—Fraudulent Scheme—Parties in Pari Delicto—Right to Relief.—In an action to recover on notes given for the privilege of conducting a popularity contest, in accordance with a plan that was a fraud on the public, the defendant for answer and counter-claim sought to recover of plaintiff the amount of several other notes issued for the same purpose and transferred to bona fide holders for value and which he had been required to pay; evidence examined and held that they were both participants in the fraud and that neither could recover of the other.

A. C. & V. Y. MOORE and JOHN A. MOORE for appellant.

J. W. BLUE, JR., for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

The American Manufacturing Company is a corporation engaged in the business of selling plans for conducting automobile popularity contests. On July 1st, 1911, it entered into a contract with S. M. Jenkins, whereby it sold him the right to put on a contest. As a part of the contract, it agreed to furnish him an automobile, a book of instructions and other literature, and to increase the circulation of his newspaper and the revenue therefrom. It also gave him a bond providing that if his gross sales were not increased $4,800 the next year it would supply the deficiency to the extent of 15 per cent. of that sum. In consideration of this undertaking on the part of the American Manufacturing Company, Jenkins executed and delivered to the company ten promissory notes for $150 each and one for $100. With the exception of the three notes sued on in this action. all the notes were sold and transferred to *bona fide* purchasers for value without notice, who brought suit thereon and recovered judgments against Jenkins. This action was brought by the American Manufacturing Company to recover on the three notes which had not been sold. Jenkins filed an answer and counter-claim, pleading, among other defenses, that the contest scheme was fraudulent and contrary to public policy, and that the company, with knowledge of the fraudulent character thereof, had transferred the notes to *bona fide* purchasers for value and he had been compelled to pay the same. He asked that the petition be dismissed and that he recover over on his counter-claim. On final hearing, the plaintiff's petition was dismissed and defendant given judgment in accordance with the prayer of his answer and counterclaim. The American Manufacturing Company appeals.

In addition to the above facts, it appears that shortly after the execution of the contract the company mailed to Jenkins the book of instructions and other literature. Some weeks later they sent him an automobile, which was injured while being taken from the car. Jenkins instituted the contest and proceeded to conduct it. He occasionally sent to the manufacturing company certain reports indicating the progress of the contest. The contest continued through August, September, October and November. On December 29th, 1911, he wrote the com-

pany that he had been advised by counsel that the scheme was fraudulent. He then discontinued the contest and put on a contest of his own.

The book of instructions provides that the person conducting the contest shall make a list of two hundred names to be sent to the American Manufacturing Company. Thereupon the company prepares a voting register, which is sent to the person conducting the contest. When the voting register is returned, the person conducting the contest is directed to send to the persons on the list the following letter:

"Dear Miss:—We are notifying you that you were nominated as a contestant in our piano (or automobile) contest, and No............ was assigned to you. Your friends have cast ........... votes to your credit, which shows that they are rooting and working for you. If you will ask five or ten more of your friends to subscribe to our paper or patronize our jobbing and advertising department, you will be able to increase your standing by 2,500 votes for each subscription sold. Get busy. No publicity. Everybody's name will be held secret. Boost your number and watch your standing every week in our paper. Yours truly."

The next week he was directed to send the following letter :

"Date............................................

"Dear Miss:

"We wish to notify you that you have been nominated as a contestant in the piano (or automobile) contest, and No............ was assigned to you. Your friends have cast ........... votes to your credit, which brings you in the lead. If you will have five or ten more of your friends to patronize our store and make their purchases here, they will receive votes, which they can bring to you or have them credited to your number, and you will have an excellent opportunity of winning the piano (or automobile).

"As we are contemplating giving away weekly prizes and monthly prizes, you will have an opportunity of winning some of these. We are also issuing trading books good for twelve months' trade at our store, which will entitle the contestant to 50,000 votes for each $5.00 deposited in advance. These books will be put on sale at the sixth week of our contest and not before. Call and get particulars. Watch your standing by number

on our bulletin board in the window and in the news-paper each week. Boost your number. No publicity. Get busy. Everybody's name is secret. We wish you success. Yours truly.''

For the purpose of keeping the contestants interested and as near equal as possible, the book contains the following directions:

"The way we do it is that, after we have recorded and transferred the votes on that recording date, we run over the standing of contestants by thousands, and as there are eight on a page, it is a very simple process to find out who stands the highest. When you have the highest number, then credit in the space for that week each contestant who is more than 5,000 votes below the leader with any number that comes into your head which will bring her within the 5,000 limit. This 5,000 limit is for the first six weeks of the contest, after which allow a 10,000 votes limit, and after the third or fourth month of the contest, 100,000 and 200,000 votes limit. It is always advisable to put six or ten who are absolutely inactive, and who have brought in no votes at all, in the lead, say anywhere from 1 to 100, as you will see from the way we keep the register. Always place the letter 'C' in front of those complimentary votes so that at the end of the fifth month of your contest you can sum up all the credits given to each contestant and give every other contestant a like number of votes, so that each person will have an equal amount of those complimentary votes, thus making it equal and fair to every person connected with the contest.

"Now, when you make up the complimentary votes at the end of the fifth month, always make a special sale, offering on a certain day say 100,000 votes for a dollar, and after all the votes have been recorded in the register, take the contestant's column and pick out the amount of complimentary votes as aforesaid. The reason of giving these tremendous bonus of votes on this special sales day is to off-set the big jump that may be caused by equalizing the complimentary votes, and gives a good reason for the rapid jump, as every $10.00 purchase at that time would increase the standing by 1,000,000 votes.

"If they don't reply to that or record votes before that seventh day, then take any lady or man, who comes into your store and tell them that somebody has been casting votes to the number which you have just elim-

inated, and as one of your signs reads that the contestants number from 1 to 200, and if they are not a contestant, to cast votes for one of the above numbers, that is the reason why somebody has been casting votes for that particular number and that number being in the lead and your not having any contestant for it is the reason why you wish to give them that number, which will put her way up in the lead, and you will find, Mr. Merchant, that there is not a single person who will refuse to enter the contest at this stage of the game, while if you offered her only 2,000 votes to start with she would think that the others were so far ahead that she would have no chance at all, and as all of these votes that she will get are actually complimentary it really makes no difference because it will be equalized at the end of the fifth month.

"Mr. Merchant, don't use any ballot box. Don't publish the contestants' names, as this is one of the methods that we have in getting the contestants active. Only publish the numbers assigned to them so that no person can come in and say, 'I don't want to run, take my name out of the paper.' By our method she must run whether she likes it or not, and even if she comes in and says, 'I don't want to run as a contestant,' you simply tell her that the contest manager, Mr. Howard, says that we must accept the votes cast to that number, and if she should win the piano, why, she can give it away if she doesn't want it. Carry all contestants in the register, active or inactive.

"As a matter of fact this contest is absolutely made to sell goods and not to waste time in the operation of the contest by bookkeeping, giving out votes or counting votes. You don't have to count their votes at all. We allow the contestants themselves to count their votes and write their number and amount of votes on top slip only. That saves you a lot of labor and trouble. Votes really don't mean anything to you, and, as a matter of fact, each contestant believes that you are going to take her package of votes and count them, and she will try her very best to get the proper amount down.

"Where one or two contestants have accumulated during the week say two or three million votes in advance of everybody else, in order to keep the contestants as close as possible and to prevent one contestant from causing everybody else to lose interest, we advise you that when they bring in their votes the following week,

give them, instead of credit for the entire amount of votes, a receipt, one for each week say for a certain equal proportion, good and available during the contest, and the receipts can only be voted on the week for which they are dated. A receipt of this character, 'Good for 30,000 votes May 7, 1911,' 'Good for 30,000 votes May 14, 1911,' and so on until every one of the votes are used up. You can explain to the party as follows, 'That it takes too long to count the votes, and if you have to record all the votes that day it would be impossible to check up the enormous amount of votes that he has got. Therefore, you will give him his receipts, and that you will credit him with at least 30,000 this week, and if you can use more you will call in more receipts the following week until you can get them all checked up.' In every case we have found this will work. The contestant is satisfied because he has receipts, which will be credited during the contest, and you won't have to give enormous complimentary votes in order to bring each contestant within a reasonable distance of each other, and you and the other contestants are all satisfied, as it doesn't appear in the standing.''

From the foregoing it will be observed that the persons who are notified of their nomination are led to believe that they have been nominated and voted for by some of their friends, when, as a matter of fact, they are placed in nomination and given complimentary votes by the person conducting the contest. It further appears from the plan that persons who take no interest and are inactive are placed in the lead by giving them complimentary votes. Not only that, but the plan provides for the elimination of inactive contestants and the transfer of their votes to others, who are led to believe that the votes have been actually cast by their friends. People who are actually in the lead are led to believe that they have fallen behind, when, as a matter of fact, the contestants who have passed them have acquired their new positions, not by *bona fide* votes, but by complimentary votes entirely. Another part of the scheme is not to record the votes of the leading contestants, but to give them mere receipts and thus keep in the race the other contestants, who, if they knew the facts, would probably cease their efforts or withdraw from the contest. We regard further discussion of the plan as unnecessary. It speaks for itself. It is founded on deceit and misrepre-

sentations. It is no defense to all this to say that in the end the complimentary votes are equalized and the contestants are put on the same footing. That may be true, but all during the contest they have served their purpose by deceiving the contestants and the public in general. We do not doubt that voting contests may be fairly planned and fairly conducted, but a plan like this, that is based on falsehood and deceit, and operates as a fraud, not only on the contestants themselves, but on the public in general, who, relying on the misrepresentations, are led to come to the assistance of their friends and spend money unnecessarily in their behalf, should not receive the sanction of the courts, and any contract based on such a fraudulent scheme is in violation of good morals, inconsistent with honest purposes, against public policy and will not be countenanced by the law or by the tribunals which administer the law. From such a foundation no cause of action can arise. Courts will not authorize a recovery by either participant, nor will they restore to either anything that he may have paid to the other. The parties will be left exactly where they have placed themselves. Snead v. Williamson, 16 B. Mon., 492; Chapman v. Haley, 117 Ky., 1004; 25 Ky. Law Rep., 2182; 80 S. W., 190; Howe's Exor. v. Griffin's Admr., 126 Ky., 373.

But defendant insists that he and plaintiff are not in *pari delicto* and that the above rule has no application to him. It is argued that he falls within the exception laid down in the case of Anderson's Admr. v. Merideth, 82 Ky., 564, where the court said:

"Where there is imposition, duress, oppression, threats, undue influence, taking advantage of necessity, or weakness, the party thus placed at disadvantage, although participating in the fraud, may be relieved in a court of equity as against his co-wrong-doer." The point is made that defendant did not receive the book of instructions until some time after the notes were executed; that he testified that he carried out the instructions only insofar as he thought they were fair; and that, upon being advised by counsel that the scheme was fraudulent, he immediately notified the company. It is clear that he knew of the plan of conducting the contest at least three months before he repudiated it. During that time he never complained of the plan, but complained only of the fact that the results were not satisfactory. It is certain that defendant was not a victim of duress, oppres-

sion, threat or undue influence. He may, in the first instance, have been the victim of imposition, and if he had acted promptly and repudiated the transaction there might be some reason for holding that he was not in *pari delicto* with plaintiff. He could not carry on the contest for at least three months and thus participate in the illegal scheme, and then claim that he was not a party to it. We therefore conclude that neither of the parties is entitled to any relief.

Judgment reversed and cause remanded, with directions to enter judgment in conformity with this opinion.