## Harrison v. Perry.

(Decided June 13, 1919.)

## Appeal from Madison Circuit Court.

1. Bills and Notes—Bona Fide Holder.—To bring himself within the defense of a bona fide holder the latter must prove that the note was complete and regular upon its face; that he became the holder of same before it was overdue; that he took it in good faith and for value, and at the time it was negotiated he had no notice of any infirmity in the note or any defect in the title of his assignor.

2. Bills and Notes—Popularity Contest—Deceit.—Inducing candidates in a popularity contest to become interested by false nominations and fraudulent votes is such a deceit upon the unsuspecting candidates, and so opposed to public policy, that the courts will not give their sanction to such practice and a recovery on a note executed pursuant to such fraudulent plan will be denied.

BURNAM & BURNAM for appellant.

GRANT E. LILLY and D. M. CHENAULT for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Affirming.

Appellee entered into a contract with the Lyon-Taylor Company (hereinafter referred to as the company), January 28, 1914, by the terms of which he promised to pay to said company the sum of twelve hundred dollars for three pianos, and other articles incident to the conduct of a popularity contest. Finding he had overreached himself in the making of the contract, appellee notified the company of this fact, and as a result of certain correspondence between them a contract of a similar nature, but for a smaller amount, was entered into, the cash consideration being five hundred and sixty dollars, represented by a note dated May 11, 1914, and payable in four installments of $140.00, each, due in two, three, four and five months thereafter. The first installment on the note was not paid, so appellant, to whom the note had been assigned, instituted this action. Among other things appellee alleged in his answer that appellant was not a holder in good faith; the company had not complied with its contract; that agents of the company had represented to him the piano was worth $400.00, when as a matter of fact it was not worth over $75.00, or $80.00,

and that the scheme, which was the basis of the note sued on, was a fraudulent one.

In the contract sued on is this provision:

"To make the above guarantee binding upon you we agree to take this shipment promptly, carry out your contest plan fully, issue votes as directed in rules, promptly meet all obligations entered into in this agreement, keep goods displayed, report gross sales every thirty days during life of this agreement, and promptly furnish all information requested in pushing this contest."

The rules of the contest are not in the record, but in one of the letters received by appellee from the company was an enclosure entitled "Way to get candidates," in which we find these suggestions:

"The merchant putting on a piano contest should not by any means expect candidates to enter the contest of their own accord to a sufficient extent to insure success. Again, he should not expect and should not wait for the friends of the young ladies to nominate them. The best way to secure a list of candidates lies in nominating them yourself. Sit down and make up a list of forty or fifty or perhaps more active and energetic young ladies in all directions around you in the territory from which you desire to draw trade.

"Write each name on a ballot and drop in the ballot box where it will be found and counted by the judges at the first counting of the ballots. The young ladies will then be listed as candidates. Immediately after the first counting of votes write each young lady a short note, copy in our general instructions, advising her that she had been nominated in the race and that she had 1,000 votes to her credit. Request her to call at the store, see the prizes and learn full particulars concerning the race.

"Don't make the mistake of going around and asking the candidates if they desire to enter. Many of them would refuse, simply because they would not have the determination necessary. On the other hand, if you take matters into your own hands and nominate these girls many of them will get out and hustle who would otherwise never have taken interest in the contest.

"In selecting these candidates be sure that a considerable number of them come from families who have heretofore been trading with your competitors."

The Lyon-Taylor Company is an unincorporated concern with headquarters at Iowa City, Iowa. It is owned by M. F. Price, who is also the owner of the Puritan Mfg. Co., which is engaged in the same character of business, and he is likewise the owner of several other concerns, all of which have offices in the same building.

The present appellant and others have appeared as parties appellee or appellant in a number of cases before this court involving transactions similar to the one here.

In Commercial Security Co. v. Robertson, 152 Ky. 336; Pratt v. Rounds, 160 Ky. 356; Harrison v. Pearcy-Coleman Co., 174 Ky. 485; Harrison v. Nicholason-Foley Co., 179 Ky. 513; Gardiner v. Commerical Security Co., 184 Ky. 164, the exact nature of the contract involved does not appear and a right to recover on the notes sued on was sustained, because there was nothing to show the plaintiffs were not *bona fide* holders. But in the cases where the rules of the contest and the real nature of the contract have been disclosed this court has condemned such schemes in no uncertain terms.

Harrison v. Ford, 158 Ky. 467. The present appellant and the Puritan Mfg. Co. were involved, and the court held that inasmuch as there was sufficient evidence to take the case to the jury upon the issue as to whether Harrison was a holder in due course, a verdict in favor of the defendant would not be disturbed.

American Mfg. Co. v. Record Press, 166 Ky. 548. The court after quoting at length from a book of instructions says:

"From the foregoing it will be observed that the persons who are notified of their nomination are led to believe that they have been nominated and voted for by some of their friends, when, as a matter of fact, they are placed in nomination and given complimentary votes by the person conducting the contest. It further appears from the plan that persons who take no interest and are inactive are placed in the lead by giving them complimentary votes. Not only that, but the plan provides for the elimination of inactive contestants and the transfer of their votes to others, who are led to believe that the votes have been actually cast by their friends. People who are actually in the lead are led to believe that they have fallen behind, when, as a matter of fact, the contestants who have passed them have acquired their

new positions, not by *bona fide* votes, but by complimentary votes entirely. Another part of the scheme is not to record the votes of the leading contestants, but to give them mere receipts and thus keep in the race the other contestants, who, if they knew the facts, would probably cease their efforts or withdraw from the contest. We regard further discussion of the plan as unnecessary. It speaks for itself. It is founded on deceit and misrepresentations. It is no defense to all this to say that in the end the complimentary votes are equalized and the contestants are put on the same footing. That may be true, but all during the contest they have served their purpose by deceiving the contestants and the public in general. . . ."

While, as before stated, the rules or instructions as to the contest are not in evidence, yet from the document entitled "The way to get candidates," hereinabove referred to, it would seem that the method condemned in the preceding case is not dissimilar to the one here, the principal difference being that in the former the fictitious or fraudulent votes were credited to the several candidates during the progress of the contest, but in the present case the candidates are nominated through phony votes and thus made to believe they have in good faith been nominated by some of their friends. As stated in the foregoing opinion it is no defense to say that the complimentary votes are equalized and the contestants put on the same footing.

In our judgment the contest in the present suit is a fraud on the public and violates good morals just as much as the plan referred to in the above case, and one should no more receive the sanction of the court than the other.

In Commercial Security Co. v. Archer, 179 Ky. 842, we had under consideration another of these contracts. The court says that the opinion in the Record Press case, *supra,* meets with its unqualified approval.

In the last named case reference is made to certain sections of the Negotiable Instrument Law, and it is said that defendant having successfully sustained the burden which the law cast upon it and established by his proof that the consideration of the note sued on was vicious and sufficiently so to defeat the collection of the notes in the hands of the original holder, that, therefore, it became necessary, under the rule stated, governing·

the rights of the parties, for plaintiff, by its proof, to bring itself within the defense of a bona fide holder in due course as prescribed by section 52 of the Negotiable Instrument Law, and to do this the court says it was incumbent upon plaintiff to prove that the notes were complete and regular upon their face; that it became the holder of them before they became overdue; that it took them in good faith, and for value, and that at the time they were negotiated to it, plaintiff had no notice of any infirmity in either of the notes, or of any defect in the title of the American Mfg. Co., plaintiff's assignor.

After referring to the testimony of plaintiff's president the court says:

"In the case before us there is no doubt about the establishment of the fraud, and there is but little less doubt about the failure of the plaintiff to sustain the burden to prove that it was a purchaser in good faith. The fact that plaintiff paid a consideration for the notes is insufficient of itself to show, under the facts of this record, that it did not have actual knowledge of the fraud entering into the consideration of the notes. 8 Corpus Juris 506."

That the plaintiff in the instant case has likewise failed to sustain the burden that he was a purchaser in good faith is evident from his testimony. He was at most a very reticent witness, but from his deposition the following facts were developed. He is a public accountant; has audited the accounts of the Lyon-Taylor Company each year for ten years, and each of these audits required from three weeks to two months of his time; he does similar work for the Puritan Mfg. Co., and the other Price owned companies. He refused to say how much time he gave each year to these several companies; does not know the size nor the personnel of the office force of any of the companies; believes he came into possession of the notes sued on in July, 1914; the exact date is not given. It might be well at this point to call to mind that the first installment was due July 11, 1914. He knew the company had had some litigation over their paper; he made no investigation as to the financial standing of appellee; he lent the company $2,000.00 for $2,245.00, of their paper, including appellee's notes, but does not know whether he let the company have this money in cash or by check; had previously lent money to the company and to the Puritan Mfg. Co.

The Iowa attorney representing him was also attorney for the companies. He did not employ said attorney in this case, although said attorney appears for him in the taking of his deposition. It was understood that all legal costs were to be borne by the company. He has sued on other paper of the company. Collections made on the company's paper are deposited to his credit; does not know who gave instructions to said attorney as to the application of credits through collections made on the company's paper. He would get the money lent whether he succeeds or fails in this suit; some of the collateral given him at the time the note sued on was assigned to him has been collected but none applied on the note in suit. This is the gist of his testimony.

The contest was never put into effect; appellee declined to receive the piano, and returned the silverware and other articles sent him. It seems clear to us that the facts of this case are not essentially different from the cases last above referred to.

The plan of contest was conceived in fraud; initialed with an unreal, an inflated vote; the nominations were false, deceit being practiced upon the unsuspecting candidates; it was an imposition upon the public, and the courts should not give their sanction to such deceitful practices.

There is no complaint of the instructions and the jury having found for the defendant their verdict will not be disturbed.

Wherefore the judgment of the lower court is affirmed.