# Osborn, et al. v. Apperson Lodge, Free and Accepted. Masons No. 195, of Louisa, Ky.

(Decided March 12, 1926.)

## Appeal from Lawrence Circuit Court.

1. Auctions and Auctioneers.—Member of lodge is not precluded from. bidding at auction sale of land owned by lodge.

2. Auctions and Auctioneers—Purchaser at Auction Sale by Lodge Cannot Complain Property was Run up by Person Bidding in Good Faith for Member of Lodge.—Where member of lodge procured man to bid for him at auction sale of land owned by lodge with instructions to bid only certain amount, purchaser cannot complain that property was run up on him, where bid was made in good faith.

3. Auctions and Auctioneers—Purchaser of Lot at Auction Sale Cannot be Said to have Been Influenced in Bidding by Subsequent Private Arrangement with Purchaser of Another Lot.—Purchaser of lots at auction sale cannot be said to have been influenced in his bidding because of private arrangement subsequently made with another bidder, whereby he procured lot at sum less than bid.

4. Auctions and Auctioneers—Secret Arrangement Giving Bidder Lot of $200.00 Less than Bid Held Not to Affect Bidders on Lots Subsequently Sold.—Secret arrangement with purchaser whereby he was to secure lot for $2,500.00, although his bid was $2,700.00, could not have had any material effect upon bidders on lots subsequently sold, in view of good-faith bid of some other bidder of trifle less than $2,700.00.

5. Auctions and Auctioneers—Evidence·Held to Rebut Presumption Buyer of Lot at Auction was Influenced by Fictitious Bids on Other Lots.—Evidence held to rebut presumption that purchaser of lot at auction was influenced by fictitious bids theretofore made on other lots, under private arrangement whereby purchasers paid certain amount although bidding more.

6. Auctions and Auctioneers—"By-Bidder" at Auction Defined.—"By-bidder" is one employed by seller or his agent to bid on property with no purpose to become purchaser, so that bidding thereon may be stimulated in others who are bidding in good faith.

7. Auctions and Auctioneers—Purchaser of Lot having Secret Arrangement for Price Below Bid Held Not By-Bidder so as to Relieve Bidder on Other Lot.—Purchaser of lot with secret arrangement whereby he paid certain price, although bidding more, was not technically a by-bidder so as to relieve purchaser of other lot at same sale from purchase for other and different reasons having nothing to do with such arrangement.

8. Auctions and Auctioneers—Presumption of Fraud on Purchaser By-Bidding Rebuttable Where Bidding is on Lots Sold Before One Knocked Off to Complainant.—Secret by-bidding where single

parcel is offered for sale raises absolute presumption that purchaser has been imposed upon, but, where by-bidding is upon lots sold in subdivision before one knocked off to complainant, presumption is only prima facie, which may be rebutted.

C. FRED SEE, JR., and S. S. WILLIS for appellants.

GEORGE B. MARTIN, A. O. CARTER and JOHN L. SMITH for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Prior to May, 1924, appellee for a number of years had been the owner of a plot of ground, something over 200 feet square, in the residental section of Louisa. Some time before that it appointed a committee of three of its members to take charge of this property and employ some real estate agency to sell the same. The property was bounded on the north, east and south by wide, well paved streets and pavements, as well as curbing and guttering; but the street on the west was not so paved and was only about half as wide as the other streets. A twelve foot alley, running from east to west, was put through the center of the property, and the plot north of that alley was subdivided into five lots facing upon the wide street at the north, and each of them were 41.74 feet wide and 98.35 feet deep. The plot south of the alley was similarly divided into five lots of approximately the same dimensions.

Beginning at the northeastern lot on the northern plot the five lots north of the alley were numbered 1, 2, 3, 4 and 5, and the five lots south of the alley beginning at the east were numbered 6, 7, 8, 9 and 10. So that there were four corner lots in the division, one and five on the north of the alley and six and ten on the south of the alley, and three inside lots on the north of the alley facing on Madison street at the north, and three inside lots south of the alley facing on Franklin street at the south.

The committee appointed by the lodge entered into a contract with a real estate agency which, after the subdivision of the lots as stated, advertised a sale for the 14th of May, 1924, at which sale the ten lots in the aggregate brought something more than $28,000.00. At that sale appellant Osborn became the purchaser of the corner lot No. 6 south of the alley at $3,650.00, as well as the inside lot adjoining it, No. 7, at $2,825.00; and the appellant Ethel R. See became the purchaser of lot No. 2

adjoining the corner lot No. 1 north of the alley at the price of $2,825.00.

The contract between the committee of the lodge and the real estate agency stipulated that the lodge was to receive in any event $25,000.00 net for its property, and that otherwise it reserved the right to reject any and all bids. This announcement was made at the sale.

The corner lot No. 1 at the northeast was first offered for sale and brought $3,550.00, and then the next lot No. 2, an inside lot next to No. 1, was offered, and being bid to only $2,200.00 was taken down. Then it was determined by those in charge of the sale they would first sell the four corner lots before offering any of the inside lots, and corner lot No. 5 at the northwest was next offered and brought $2,950.00. Next corner lot No. 10 at the southwest was offered and sold at $2,850.00, and then corner lot No. 6 at the southeast was offered and bought by appellant Osborn at $3,650.00. Then lot No. 7, adjoining corner lot No. 6 so purchased by Osborn, was offered and he became the purchaser of that at $2,825.00.

After the sale of lot No. 7 to appellant Osborn, the inside lots numbered 4, 3, 2 on the north of the alley were sold in the order named, and appellant See became the purchaser of lot No. 2, and thereafter inside lots numbers 9 and 8 south of the alley were sold in the order named.

As has been stated the contract between the owner and the real estate agency stipulated that the owner was to have $25,000.00 net for its property, and accordingly when the sale was begun it was definitely stated to the assembled crowd that the seller reserved the right to reject any and all bids. This appears to have been necessary under the terms of the contract.

After the four corner lots and lot No. 7 south of the alley had been sold for an aggregate of $15,825.00, it was apparent that if the remaining five inside lots could be made to average $2,500.00 each the sale would be a go, and a profit would be left, over and above expenses, for the real estate agency. Accordingly after the sale of the first five lots it was agreed that the purchasers of the three corner lots, other than Osborn who had already purchased the inside lot adjoining his corner lot, might each have the lots adjoining the corner lots so purchased, at $2,500.00, but that such lots must be publicly sold and the purchasers of the respective corner lots should be the

highest bidders at the sale of such adjoining lots, but would be required only to pay $2,500.00.

This offer was taken advantage of by Burchett, the purchaser of corner lot No. 5, and when inside lot No. 4, which was sold before appellant See became the highest bidder for lot No. 2, was offered, it was necessary for Burchett to bid that lot up to $2,700.00, at which figure it was knocked off to him, although under his agreement he actually only paid $2,500.00 for it. This happened after the purchase by Osborn of his two lots and before the purchase by appellant See of her lot, and that appears to be the only distinction between the two cases.

The reliance of each of the plaintiffs for a cancellation of their bids and a return to them of the initial payments made, is wholly upon their allegation that at the sale there was bybidding and puffing upon the sale of several of the lots at the instigation and procurement of members of the committee, and the real estate agency conducting the sale.

The first specific complaint of misconduct is that Cooksey, a member of the lodge committee who had arranged with the real estate company for the sale, had himself made bids on several lots; but if he, because he was a member of the lodge, might in any sense be said to have had such interest in the property as to preclude him from the right of bidding, under the rule laid down by this court in Manuel v. Haselden, 206 Ky. 796, he would not have been precluded from the right to bid. Likewise complaint is made because Cooksey procured a man named Mullins to bid for him on lot No. 7, bought by Osborn, and directed Mullins to bid as much as $2,800.00 on that lot for him. Mullins in fact bid for him, $2,800.00, and then Osborn bid $2,825.00; but Mullins was unknown to the real estate man who was conducting the sale, and Mullins being a man of swarthy complexion and having the appearance of a foreigner, the real estate agent fearing the effect upon the sale of other lots if such foreigner should buy that one, and being satisfied with the bid of $2,825.00, indicated to the auctioneer to knock it off, and complaint is made by Osborn of this conduct. The transaction is fully explained in both the evidence of Cooksey and Mullins, and we are at a loss to understand how Osborn's rights could have been affected in any way by the auctioneer knocking the property off to him, and presumably preventing another bid by a person suspected

of being an objectionable purchaser. It so happened that the limit of Mullins' authority to bid for Cooksey was $2,800.00, and when Osborn bid $2,825.00 Mullins announced that was his last bid, and from this the inference is attempted to be drawn that Cooksey's directions to Mullins were intended to run the property up on Osborn. The evidence, however, is convincing that the bid of Mullins for Cooksey was in good faith, that he went to the extent authorized, and that if the property had been knocked off to Cooksey he would have taken and paid for ti. This evidence is strengthened by the additional fact that Cooksey subsequently bid upon and became the purchaser of another lot.

It is likewise complained that a private arrangement was made with Carter by which he was to become the purchaser of lot No. 9 adjoining No. 10 previously bought by him for his son-in-law, at the price of $2,500.00, and that the arrangement was carried out, although that lot when sold brought a higher price than that. The facts are that Carter, the father-in-law of Stewart, bought lot No. 10, a corner lot, and was given the right to purchase the adjoining lot No. 9 at $2,500.00, provided he was the last bidder, even though he was required in fact to bid a larger sum. But in as much as lot No. 9 was sold after the transactions involved in both the Osborn and See cases, we are unable to comprehend how any bybidding or puffing upon that lot could have influenced either of appellants in the purchases they made.

But it is said that a private arrangement was made with Burchett by which he bought lot No. 4 for $2,500.00, when in fact he bid $2,700.00 for it at the public sale. This, however, occurred after the purchase by Osborn of his two lots and before the purchase by See of lot No. 2.

We are unable to see after the announcement at the sale in the first place that the seller reserved the right to reject any and all bids, why it was necessary to go through the form of a public sale to sell this lot to Burchett. It seems to have been the policy of the sellers after the corner lots were sold, and lot No. 7 adjoining one of them had been disposed of, to give the other persons who had bought corner lots the right to buy the adjoining lots at $2,500.00; and this arrangement seems to have grown out of the situation developed by the selling of the first five lots at satisfactory prices, and was deemed advisable so as to insure the success of the sale.

They seemed to have reasoned after the first five lots were sold, that if they could make the remaining five bringing an average of $2,500.00 the whole would produce something over $28,000.00 which would pay all expenses, pay the $25,000.00 required by the lodge, and leave a profit for the real estate men.

It appears that the lot No. 4, bought by Burchett for $2,500.00, but for which he actually bid $2,700.00, was the result of an agreement between him and the manager of the sale which was not made public, and the only difficulty we have had in the case is to determine what effect his conduct in bidding $2,700.00 publicly, when he had a private arrangement that he should only pay $2,500.00 had upon the subsequent sale of lot No. 2 to appellant See. This was long after Osborn had bought his two lots, and can in no sense be said to have influenced his bidding upon them.

But there was a good faith bid upon the lot No. 4 so purchased by Burchett of a little less than $2,700.00 by some other bidder, and it cannot therefore be said that the secret arrangement between Burchett and the sellers could have had any material effect upon the bidders upon lots subsequently sold.

There was no bybidding upon the lot No. 2 sold to appellant See, but there was good faith competitive bidding which required her to bid $2,825.00 for the same with a good faith bidder bidding almost that amount; and although there may be a presumption that she was influenced by fictitious bids theretofore made upon other lots in the same sale, the facts and circumstances in evidence tend strongly to rebut that presumption. In the first place there is evidence tending to show that she stated after the sale she did not want the lot because the purchaser of an adjoining lot had too many children. And it appears that she bid exactly the same amount for this lot north of the alley as Osborn had previously bid for the corresponding lot south of the alley.

Strictly speaking a bybidder is one employed by the seller or his agent to bid on the property with no purpose to become the purchaser, so that the bidding thereon may be stimulated in others who are bidding in good faith, while he is safe from risk because of a secret understanding that he shall not be bound by his bids. Story on Sales, section 482; 2nd Kent's Com., page 537; 2 R. C. L. 832, 833; Burdon v. Seitz, 206 Ky. 336.

It is apparent, therefore, that notwithstanding Burchett had the secret arrangement with the sellers by which he was to get the property at a less price than he actually bid, he was not technically a bybidder; and while one injuriously affected by this arrangement might have equities arising out of it, it is reasonably clear that appellant See seeks to be relieved from her purchase for other and different reasons having nothing to do with this arrangement by which Burchett became the purchaser of that lot. In the first place the announcement at the sale that the right was reserved to reject any and all bids, appears to have made it wholly unnecessary to put up for public sale lot No. 4 at all; and that it would have been perfectly justifiable for the seller to have sold it privately to Burchett at $2,500.00 and not offered it at all.

Not only so, it appears to be the rule that when a tract of land is divided into lots, and sales of them are made at the same time and as parts of the same transaction, while there is a presumption that the bidders on the last lots offered are influenced by fictitious bids upon the lots previously sold, such presumption may be rebutted by the facts and circumstances. 2 R. C. L., page 1130.

Where there is only a single parcel offered at a sale held without reserve, if there is secret bybidding, the purchaser has the absolute right to repudiate the contract, and the presumption that he has been imposed upon its absolute. Burdon v. Seitz, 206 Ky. 336. But in a sale of lots in a subdivision, where the bybidding is upon lots sold before the one knocked off to the complainant, it is only a *prima facie* presumption which may be rebutted. Curtis v. Aspinwall, 114 Mass. 187 (19 Am. Rep. 332.)

In that case (page 340 Am. Rep.) the court said:

"The designed and natural effect of bybidding upon the lots first sold is to mislead the judgment of the buyers as to the value of the whole tract, and to induce them to bid more than they would upon a fair sale. There is a presumption that the last bidders are influenced and injured by the previous fictitious bids, and they may avoid the sale without further proof that they are influenced and injured, if there is no evidence tending to control or rebut such presumption. But this presumption may be rebutted. If the bybidding had no effect or influence upon the

purchaser's bid, the latter cannot avoid his contract."

Evidently in this case the presumption growing out of the Burchett transaction with reference to the sale of lot No. 4 is sufficiently rebutted to justify the dismissal of appellant See's petition.

The chancellor below in a memorandum opinion, being on the ground and familiar with the parties, after an analysis of the evidence, reached the conclusion that there was no bybidding, and that the sale was fairly conducted in so far as it affected either of appellants.

Judgment affirmed.