### Robenson, et al. v. Yann, et al. (Two Cases.)

(Decided March 13, 1928.)

(Rehearing Denied, with Modification, May 1, 1928.)

Appeals from Jefferson Circuit Court
(Chancery Branch, First Division).

1.  Specific Performance.—In suit for specific performance of written contracts for lots purchased by plaintiffs at an auction sale, evidence held sufficient to establish defense that there was fraudulent transaction between plaintiffs and those in control of auction, whereby prices publicly paid should be disregarded and other less prices privately agreed upon should be inserted in purchase contract.

2.  Appeal and Error.—Court of Appeals will give weight to chancellor's finding which is sustained by evidence.

3.  Specific Performance.—Remedy of specific performance is one that will not be granted as matter of right, but its application rests in court's judicial discretion, informed and directed by established principles, rules and practices of equity jurisprudence.

4.  Specific Performance.—Inequitable conduct, sharp practice, fraud, or unfairness in obtaining of contract will defeat remedy of specific performance.

5.  Equity.—In equity practice, relief is conditioned on fairness of transaction and its freedom from any taint of fraud, oppression, deceit, or illegality.

6.  Contracts.—Any conduct or contract of an illegal, vicious or immoral nature cannot be made basis of legal or equitable proceedings.

7.  Auctions and Auctioneers.—Auction sales are of public concern, and law will not tolerate any fraudulent, unfair, or deceitful con-

duct in such sales and private sales by auctioneer are not allowed when employed to conduct an auction sale.

8. Specific Performance.—Contracts for lots purchased by plaintiffs at auction sale could not be enforced, where property was not knocked down to plaintiffs at prices bid, but written contracts fixed lower price therefor through agreement between plaintiffs and parties controlling auction sale.

9. Principal and Agent.—General rule is that payment properly made to an agent for known principal, in pursuance of valid authority and without fraud, duress, or mistake, may not be recovered from agent, but remedy, in event recovery of money becomes available, is against principal.

10. Judgment.—Ruling sustaining demurrer of agents to petition in suit against principals and agents, which omitted essential averments necessary to constitute cause of action against agents, is not bar to subsequent suit in which necessary allegations are supplied.

11. Auctions and Auctioneers.—Deposit on contract or partial payment of purchase price of property bought at auction or otherwise cannot be recovered, where sale falls through because of purchaser's fault.

12. Auctions and Auctioneers.—Where conduct of plaintiffs purchasing lots at auction sale was such that court of equity could not enforce contracts because they were illegal and against public policy, because of agreement between purchasers and parties controlling sale to sell at lower prices than those bid, purchasers could not recover deposits made to cover part of purchase price.

DOOLAN & DOOLAN for appellants.

L. R. CURTIS and ALLEN P. DODD for appellees.

OPINION OF THE COURT BY JUDGE WILLIS—Affirming.

These two appeals may be disposed of conveniently in a single opinion.

The first case was filed by Frank Robenson, Rose Hyman, and Harry Hyman against Elizabeth W. Yann and Christian Yann, her husband, for the specific performances of several written contracts for lots purchased by plaintiffs at an auction sale. The contracts were not denied, but performance of them was refused on the ground that the plaintiffs and the company which had charge of the auction had, without the knowledge or consent of defendants, conspired to defraud the defendants and deceive the public, and that the contracts sued upon were the fruits of the fraud. The case was prepared and submitted to the circuit court, which sustained the defense and dismissed the petition. The

plaintiffs have perfected the first appeal to challenge the correctness of that judgment.

The second case was then filed by the same plaintiffs against Elizabeth W. Yann and Christian Yann, her husband, T. G. Maddox and R. E. Kinkead and the Consolidated Auction & Development Company, to recover of the defendants jointly the deposit of $5,267.38, made by plaintiffs with defendants upon the execution of the several contracts involved in the first case to cover one-third of the purchase price which was then payable in cash under the contracts. A demurrer on behalf of Maddox and Kinkead and the Consolidated Auction & Development Company was sustained to the petition, and, when plaintiffs declined to amend, it was dismissed as to them. Yann and wife interposed the same defense employed by them to defeat the first action, and further pleaded the decree in the first case as a bar to the later one, exhibiting with the answer a copy of the opinion of the court in the first litigation. The circuit court sustained the defense and dismissed the petition. The second appeal is to review and reverse that result.

The questions presented for our determination are: (1) The propriety of the decree denying specific performance of the contracts; (2) the correctness of the ruling on the demurrer of Maddox and Kinkead and the Consolidated Auction & Development Company to the petition in the second suit; and (3) whether the circuit court was right in refusing recovery of the deposit by plaintiffs because of the facts found and decree rendered in the first action.

A brief statement of the ultimate facts is essential to a correct application of the principles controlling the decision of the questions presented.

Christian Yann and wife owned a boundary of land in Jefferson county on the outskirts of Louisville, suitable for subdivision into lots. On February 5, 1925, they entered into a written contract with the Consolidated Auction & Development Company, a corporation, by the terms of which the land was placed in the hands of the auction company for the purpose of subdividing, developing, advertising, and selling lots according to the custom followed in such situations by the auction company. The auction company was to pay all the expenses, and, as compensation and reimbursement for

expenses incurred, was to have 25 per cent. of the gross amount for which the lots were sold.

The contract provided that the property should be sold at public auction, and the highest price obtainable on sale day was to be confirmed by the owner, regardless of what that price might be. The subdivision was made, and an auction sale advertised to be held on the premises on May 2, 1925, at which time the plaintiffs and many others attended. Some lots were sold to others, but 104 of the lots shown on the map of the subdivision were bid in by plaintiffs and knocked off to them. The initial payment on the purchase price required by the contract was made, and the remaining sum was to be paid in four equal installments due in 6, 12, 18, and 24 months thereafter, secured by a vendor's lien on the lots sold. The parties met shortly after the sale to conclude the transactions, when Yann refused to sign the deeds because the contracts presented on behalf of the plaintiffs did not correspond with his understanding of the prices at which the lots had been sold at the auction, except as to lots No. 93 to No. 104, both inclusive, which he offered to convey. Yann claimed that the other lots had been sold at public auction at a much higher price than that indicated by the contracts, and that, by an illegal and fraudulent agreement, without his knowledge or consent, the auction company and the plaintiffs had made private contracts for the property at much lower prices. He asserted that an arrangement had been made privately by the plaintiffs and the auction company whereby plaintiffs were to have the lots in blocks at a certain price, agreed upon by them in advance, no matter what the lots brought at the bidding, and that plaintiffs should keep on bidding until the lots were knocked down to them, at which time they would and did enter into contracts at the price privately agreed upon, disregarding the price publicly bid.

The plaintiff Harry Hyman testified that he had no arrangement whatever with the auction company, but that he saw the advertisements of the auction and appeared at the sale to bid on the lots. After arriving there, he entered into a partnership for himself and wife with Frank Robenson, who had just made some purchases, and thereafter they bid together until they had bid in for the firm the 104 lots. A man named Bloom was also in the firm at first, but assigned his bids to Mrs. Hyman, and retired from the arrangement

before any controversy arose. He further testified that the prices shown on the contracts were the prices that he bid for the respective lots; that he paid one-third of the purchase price and was ready, able, and willing to execute notes secured by vendor's lien for the remaining consideration according to the contracts, and demanded deeds for the lots. They had executed the necessary notes and tendered them to the vendor.

He further testified that the lots were all purchased at open bidding, and were knocked down to him and his associates at the actual prices for which the property was sold by the auctioneer. He admitted, however, that there was a higher bid in some instances after the property had been knocked down to him by the auctioneer, but he claimed that the property had already been struck off to him at the prices specified in the contracts. He characterized such bidding after the sale as off-bidding or freak bidding. He admitted that he had himself bid on the lots after he had purchased them. He explained that after some lots were knocked down to him others were bidding, and he put in higher bids. His explanation was that it would put a higher value on the ground in case he wanted to sell it and the bidding was done to stimulate prices on the property after he had bought it. He said there was not much of this bidding after sales, and he was positive it was all done after his bids had been accepted and the property struck off to him. He did not know whether Robenson had made any such fictitious bids or not. Robenson, however, denied that he had made any fictitious bids, and claimed that he purchased in every instance at the highest bid, and that his contracts corresponded therewith.

The auctioneer testified that he was employed by Maddox and Kinkead, who were the owners of the auction company, and that he was selling the property while others were on the ground, taking contracts. He conducted the sale in the usual way, and, in every instance, knocked off the property to the highest bidder. It appeared, however, that this auctioneer, a few days after the sale, had made an affidavit that certain lots had sold for prices much higher than the contracts of plaintiffs indicated. He made a rather feeble explanation of his signing the affidavit, in view of his testimony as above related, and he is not entirely convincing that he was not aware of some secret arrangement between

plaintiffs and the auction company. He admitted that he thought there was something wrong.

Maddox testified that he was one of the owners and president of the Consolidated Auction & Development Company, and that he was present at the sale on May 2d. He said it was a good big sale, and that it was customary, when a price considered good is established, to take the bars down and offer to the public more than one lot at a time. On this occasion tiers of lots were offered and sold by the front foot, and that in every instance the lots were knocked down at the highest price bid. The clerks were Hoagland, Hall, and Rogers, who were instructed to keep a complete record of the sales. He denied that he had any agreement with the plaintiffs or any purchasers of lots to sell at any prices lower than those bid, and that no lots were sold or contracts signed for a less price. He emphasized the fact that to reduce the prices at which the lots were sold would reduce his contingent commission, based upon the amount of the gross sales. He took the position that every sale was genuine and that there were no fictitious bids.

Mr. Kinkead, partner of Maddox, and part owner and secretary of the auction company, testified that he was at the sale, and that the lots were sold to the plaintiffs at the prices bid therefor. He was positive that the lots were sold at the highest price obtainable and at the highest prices bid on them. He said they worked hard at the sale, and the prices obtained in some instances were much higher than the property was actually worth.

To meet the evidence offered for plaintiffs, a number of witnesses were introduced, but we shall not extend this opinion to recite all of it.

It is sufficient to say that it thoroughly established the defense relied upon, that there was some arrangement between plaintiffs and those in control of the auction whereby the prices publicly bid should be disregarded and other less prices privately agreed upon should be inserted in the purchase contracts. The arrangement was fully carried out, and the contracts sought to be enforced in this action were the result.

The chancellor found from the evidence that the property in controversy was knocked down to plaintiffs at the prices bid, but the written contracts fixed a much lower price therefor; that it could not have been done

except to deceive somebody—if nobody else, then other bidders at the sale—that it was a fraudulent and unlawful transaction which the courts would not enforce, but would leave the parties where they had placed themselves.

There was abundant evidence, as we have said, to sustain this finding, and it is the rule of practice here to give weight to such a finding.

The remedy of specific performance is one that will not be granted as a matter of right, but its application rests in the discretion of the court. It is not an arbitrary, but a judicial discretion, informed and directed by established principles, rules, and practices of equity jurisprudence. 32 C. J. p. 189, sec. 285; Darnell v. Alexander, 178 Ky. 404, 199 S. W. 17; Texas Co. v. Central Fuel Oil Co. (C. C. A.) 194 F. 1; Hennessey v. Woolworth 128 U. S. 438, 9 S. Ct. 109, 32 L. Ed. 500.

Inequitable conduct, sharp practice, fraud, or unfairness in the obtention of a contract will always defeat the remedy of specific enforcement. Dunscombe v. Amfot Oil Co., 201 Ky. 290, 256 S. W. 427; Powell v. Keene, 205 Ky. 846, 266 S. W. 659.

In the equity practice, relief is conditioned on the fairness of the transaction and its freedom from any taint of fraud, oppression, deceit, or illegality. The principle finds application in a wide range of cases arising under a variety of circumstances.

In Chapman v. Haley, 117 Ky. 1004, 80 S. W. 190, 25 Ky. Law Rep. 2182, 4 Ann. Cas. 712, many cases are reviewed, including the English case of Everett v. Williams, 9 L. Q. B. 197, where a bill was filed to settle a partnership in outlawry between highwaymen, resulting in a judgment which condemned the bill for scandal and impertinence, fined one solicitor, and transported another, imposed costs on the counsel whose name was appended to the pleading, and inflicted the death penalty on both litigants. In applying the present rule to the effect that courts merely leave the parties to iniquitous transactions where they have placed themselves, this court ruefully remarked that, instead of being harsh, the modern rule evidences "the lapse of our modern procedure from that vigorous integrity with which the ancient judges administered the common law in its primitive virtue."

The rule deducible from many adjudications is that any conduct or contract of an illegal, vicious, or immoral

nature cannot be the basis of a legal or equitable pro-
ceeding and the courts invariably leave the parties in
such cases in the dilemma they have themselves devised.
McMahon v. Lewis, 4 Bush, 138; C. & O. Ry. Co. v.
Maysville Brick Co., 132 Ky. 643, 116 S. W. 1183; Hunt
v. Smith, 191 Ky. 443, 230 S. W. 936, 17 A. L. R. 588;
Commercial Security Co. v. Archer, 179 Ky. 846, 201
S. W. 479; Jones v. Henderson, 189 Ky. 417, 225 S. W.
34, 20 A. L. R. 1471; American Mfg. Co. v. Crittenden
Record-Press, 166 Ky. 548, 179 S. W. 456; Johnson v.
McMillion, 178 Ky. 711, 199 S. W. 1070, L. R. A. 1918C,
page 244.

Auction sales are of public concern, and the law
will not tolerate any fraudulent, unfair, or deceitful con-
duct in such sales. Puffing is forbidden, as is also the
stifling of competition, and private sales by the auction-
eer are not allowed when employed to conduct an auc-
tion sale. 6 C. J. sec. 14, p. 826; 6 Corpus Juris, sec. 31,
p. 830; 6 Corpus Juris, sec. 33, p. 821; Burdon v. Seitz,
206 Ky. 336, 267 S. W. 219; Osborne v. Apperson Lodge,
213 Ky. 533, 281 S. W. 500, 46 A. L. R. 117.

In view of the finding of the chancellor, which ac-
cords with the weight of the evidence, we are not author-
ized to disturb his judgment refusing to decree specific
performance of the contracts in these cases.

The first question arising in the second suit is the
ruling of the court on the demurrer of Maddox and
Kinkead and the auction company, to the petition seek-
ing recovery of the deposit made by plaintiffs on the
purchase price of 104 lots. The pleading discloses that
the successful demurrants were the agents of their co-
defendants and authorized to collect the initial pay-
ments. The general rule is that a payment properly
made to an agent for a known principal, in pursuance
of a valid authority, and without fraud, duress, or mis-
take, may not be recovered from the agent. The
remedy, in the event recovery of the money becomes
available, is against the principal. 2 C. J. p. 821, sec.
495; Cooper v. Ratliff (Ky.) 116 S. W. 748; Geary v.
Taylor, 166 Ky. 501, 179 S. W. 426.

The petition does not allege that the agents had not
paid over to the principal the money collected from
plaintiffs, or that they had retained it and still had it in
their possession. We are not called upon in this case,
or justified by the record as presented, in deciding
whether plaintiffs can on a proper pleading recover

from the agents the money paid to them. Nor can we anticipate defenses that might be made to such an action, or estoppels that might arise against the agents by reason of the testimony given by them in this case. Those questions can only arise when duly presented. It is clear, however, that the ruling on demurrer to the petition herein, which omitted essential averments necessary to constitute a cause of action against the agents, is not a bar to a subsequent suit in which the necessary allegations are supplied. Pepper v. Donnelly, 87 Ky. 259, 8 S. W. 441, 10 Ky. Law Rep. 140; Thomas v. Bland, 91 Ky. 1, 14 S. W. 955, 12 Ky. Law Rep. 640, 11 L. R. A. 240.

It remains to determine the propriety of the ruling of the court below that the principal was not liable to return the payment made by plaintiffs. It is the general rule that a deposit on a contract, or a partial payment of the purchase price of property bought at auction, or otherwise, may be recovered where the sale falls through because of some failure or fault of the vendor or the auctioneer. 6 C. J. p. 838, sec. 46. But the plaintiff must be free from the fault that defeated the deal, and, if he is to blame for the situation, he may not obtain relief.

In this case the defendants relied upon the finding in the first case to the effect that the conduct of appellants was such as to disentitle them to the remedy of specific performance, and insist that the same facts preclude them from obtaining any relief.

It does not necessarily follow from a denial of the remedy of specific performance that other relief might not be awarded. But, where the conduct under investigation was of such a nature that a court of equity could not enforce the contract because it was illegal and against public policy, the same reasoning that sustains the refusal of relief by way of specific performance, requires a like result in a suit to rescind the contract or recover payments made upon it. The authorities we have considered in disposing of the first contention seem equally conclusive of the one now made, when the case is of the character here involved.

We are of the opinion that the chancellor rightly disposed of both cases, and that nothing appears in these records to justify us in disturbing his decrees.

Judgments affirmed in both cases.